# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

Case No. 22-3475

---

**SHARI DRERUP,**

Plaintiff-Appellant,

v.

**NetJets Aviation, Inc.**

Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Ohio, Eastern Division
Case No. 2:19-CV-3499
Honorable Sarah D. Morrison

---

## BRIEF OF APPELLANT SHARI DRERUP

---

Laren E. Knoll (Ohio Bar No. 0070594)
**THE KNOLL LAW FIRM, LLC**
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com
*Lead Counsel for Appellant Shari Drerup*

Dolores Y. Leal (California Bar No. 134176)
**ALLRED, MAROKO & GOLDBERG**
6300 Wilshire Blvd., Suite 1500
Los Angeles, California 90048
Telephone: (323) 653-6530
Facsimile: (323) 653-1660
Email: dleal@amglaw.com
*Co-Counsel for Appellant Shari Drerup*

TABLE OF CONTENTS

**PAGE**

**STATEMENT REGARDING ORAL ARGUMENT**……………………………1

**STATEMENT OF JURISDICTION**……………………………………………..1

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**……………………2

**I.     INTRODUCTION**………………………………………………………………3

**II.    STATEMENT OF THE CASE**………………………………………………7

**III.   SUMMARY OF THE ARGUMENT**……………………………………19

**IV.   ARGUMENT**………………………………………………………...22

    **A.     Standard of Review**……………………………………………..22

    **B.     Appellant Established that NetJets Discriminated against Her because of Her Sex**………………………………………23

        ***1.     Appellant established a prima facie case of sex Discrimination***……………………………………………24

        ***2.     Appellant established that NetJets' alleged legitimate, nondiscriminatory reason for Appellant's Termination was pretext for sex discrimination***…………………………..30

            a.     Appellant proved pretext because of NetJets' shifting explanations for its decision to terminate Appellant………………………………33

            b.     NetJets did not terminate Appellant for the reasons It alleged………………………………………34

                *i.     NetJets did not terminate Appellant because of her difficulty during her Phenom simulator training*…………………………………………35

i

T<small>ABLE OF</small> C<small>ONTENTS</small> *(CONT.)*

**PAGE**

        *ii.*    *NetJets did not terminate Appellant because she did not continue her check ride after she failed and/or because she did not complete additional training in the Phenom*……………36

        *iii.*   *NetJets did not terminate Appellant because of an alleged attitudinal problem*………38

   **C.**    **Appellant Did Not Abandon her Mixed Motive Claim**…………40

**V.**   **CONCLUSION**……………………………………………………42

**CERTIFICATE OF COMPLIANCE**…………………………………………..43

**CERTIFICATE OF SERVICE**………………………………………………43

# TABLE OF AUTHORITIES

**CASES**                                                     **PAGE**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)……………………………………………………40, 41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)………………………………………………22

*Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F.Supp.2d 812 (E.D. Mich. 2008)……………………………………………………39, 40

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019)………….36

*Bender v. Hecht's Dep't Stores*, 455 F.3d 612 (6th Cir. 2006)…………………30-31

*Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007)…………………………23

*Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50 (8th Cir. 1977)………………………..31

*Carver v. Bunch*, 946 F.2d 451 (6th Cir. 1991)………………………………40, 41

*Chen v. Dow Chem. Co.*, 580 F.3d 394 (6th Cir. 2009)……………………22-23, 30

*Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579 (6th Cir. 2002)……………….32

*Conner v. Hardee's Food Sys.*, 65 Fed. Appx. 19 (6th Cir. 2003)………………..39

*Corrigan v. U.S. Steel Corp.*, 478 F.3d 718 (6th Cir. 2007)……………………..30

*EEOC v. Home Depot, USA, Inc.*, No. 4:07-CV-143, 2009 U.S. Dist. LEXIS 11596 (N.D. Ohio Feb. 17, 2009)………………..39

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998)…24, 39

*Evans v. Plummer*, 687 F. Appx. 434 (6th Cir. 2017)……………………………40

*Gatch v. Milacron, Inc.*, 111 Fed. Appx. 785 (6th Cir. 2004)…………………….24

## TABLE OF AUTHORITIES *(CONT.)*

**CASES** *(CONT.)*                                                    **PAGE**

*George v. Youngstown State Univ.*, 966 F.3d 446 (6th Cir. 2020)…………………30

*Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769 (6th Cir. 2016)…….23

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir. 1994)………..30

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)………………………..22

*McMillan v. Castro*, 405 F.3d 405 (6th Cir. 2005)…………………………………23

*Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992)…………………………24

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir.1994)………………24

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*,
     66 Ohio St.2d 192, 421 N.E.2d 128 (Ohio 1981)……………………………..22

*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 2004)………31

*Sagan v. United States*, 342 F.3d 493 (6th Cir. 2003)……………………………..21

*Santoli v. Vill. of Walton Hills*, No. 1:12-CV-1022,
     2015 U.S. Dist. LEXIS 27204 (N.D. Ohio March 3, 2015)………………..39

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998)……………………………36

*Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972)………………..31

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)……………………………..23

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,
     101 S.Ct.1089, 67 L.Ed.2d 207 (1981)……………………………………….23

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (*en banc*)…………………..21

TABLE OF AUTHORITIES *(CONT.)*

**CASES** *(CONT.)*                                                                    **PAGE**

*Threat v. City of Cleveland*, 6 F.4th 672 (6th Cir. 2021)……………………………22

*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996),
    *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996)……………………32

*Wheat v. Fifth Third Bank*, 785 F.3d 230 (6th Cir. 2015)…………………………23

*White v. Baxter Health Corp.*, 533 F.3d 381 (6th Cir. 2008)………………………23


**STATUTES**                                                                           **PAGE**

Title VII…………………………………………………………………………1, 22

28 U.S.C. § 1291……………………………………………………………………1

28 U.S.C. § 1331……………………………………………………………………1

28 U.S.C. § 1367……………………………………………………………………1

42 U.S.C. § 2000e…………………………………………………………………..1

42 U.S.C. § 2000e-2(a)(1)…………………………………………………………22

O.R.C. Chapter 4112………………………………………………………………22

O.R.C. 4112.02(A)………………………………………………………………...22


**OTHER AUTHORITY**                                                                    **PAGE**

Fed. R. Civ. P. 56(a)…………………………………………………………..21, 40

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Shari Drerup respectfully requests oral argument in this case due to the fact-driven nature of the issues on appeal.

## STATEMENT OF JURISDICTION

On August 13, 2019, Appellant filed her Complaint in the United States District Court for the Southern District of Ohio, Eastern Division, pleading claims of sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and Ohio's antidiscrimination law, O.R.C. Chapter 4112. (Complaint, R.1, PAGEID# 1-10). The Court exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1367.

On May 2, 2022, the District Court entered an Opinion and Order granting Defendant's Motion for Summary Judgment, and the Clerk entered Judgment pursuant to the Court's Order. (Opinion, R.58, PAGEID#814-834; Judgment, R.59, PAGEID#835).

Appellant timely filed her Notice of Appeal on May 24, 2022. (Appeal, R. 60, PAGEID#836). The District Court's Order is properly appealed to this Court pursuant to 28 U.S.C. § 1291.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.    Whether Appellant established a prima facie case of sex discrimination by establishing that NetJets treated Appellant differently than similarly situated male employees who were unable to fly the Phenom 300 due to their stature.

2.    Whether Appellant established that NetJets's legitimate, nondiscriminatory reasons for Appellant's termination were merely pretext for discrimination.

3.    Whether Appellant abandoned her mixed motive claim.

## I.    INTRODUCTION

After eleven (11) years as a pilot and a type-rating in five (5) different aircrafts, Appellant Shari Drerup ("Appellant") received an offer of employment for her dream job with Appellee NetJets Aviation, Inc. ("NetJets"). Appellant graduated from Indoctrination ("Indoc") despite a bad virus that separated her from her class for a day and a half and required make-up work. NetJets assigned Appellant to the Phenom aircraft. Though Appellant was not familiar with, nor had she previously flown the Phenom, she was unfazed and excited about her opportunity with NetJets and to learn a new aircraft.

At ground training, Appellant was assigned to Charles Felton as a Sim Partner. Felton was already a veteran with NetJets and a ranking Captain. Bill Jackson, an Indoc instructor, purposefully placed Felton and Appellant together after experiencing Appellant's southern charm, good personality and serious work ethic. Not surprisingly, Felton later described Appellant as "competent, capable, and professional from day one."

During Sim Training, Appellant experienced an immediate but small set back when Felton and their flight instructor clashed and constantly argued. Though mentioned as a reason for a slower progression in their training, NetJets did not discipline Felton for his arguments with the flight instructor. Eventually, Appellant

and Felton regained ground in their training when they were reassigned to Boyd Ashley Messenger.

With a new instructor, Appellant's issue with deflecting the rudder to full authority in an engine out procedure came to light. This means that she experienced difficulty pushing the aircraft rudder pedal to the floor when one of the aircraft engines stopped working. The issue was inconsistent but different location altitudes accounted for the inconsistency in Appellant's ability to control the aircraft when an engine stopped working. Messenger was eventually able to ascertain that Appellant's "stature precluded her from attaining full rudder control." Appellant could not push the rudder pedal to the cockpit floor, which is needed to keep the plane from rolling to the side of the nonworking engine drastically increasing the likelihood of a crash. Therefore, it is a safety issue.

When Messenger, Appellant and others advised NetJets that Appellant's stature was impacting her ability to control the Phenom, the information was not well received. Appellant was instructed to get back in the aircraft and make it work. Members of NetJets instructed Appellant to obtain a pillow and platform shoes, to adjust her seat, and to continue with training. Platform shoes are expressly forbidden by the NetJets policy manual. The pillow affected her line of sight by placing her too high. As a seasoned pilot, the suggestion that Appellant did not appropriately adjust her seat was absurd. It was the first thing she did when she sat down in any

cockpit. Appellant repeatedly advised NetJets that she could not safely fly the Phenom because of her stature.

NetJets has argued that Appellant passed other engine out maneuvers but refuses to acknowledge that different altitudes required different levels of pressure to deflect the rudder. Lesser pressure does not require the rudder to deflect all the way to the cockpit floor for control of the aircraft. NetJets also ignores that Messenger forewarned Appellant of the engine failing right each time before it occurred in the Sim. This allowed time for Appellant to slide down in her seat and start deflecting the rudder all the way to the floor. When asked if sliding down in her seat was safe, Messenger stated that he did not care how she obtained the standard as long as she got there. Clearly, this is not safe. NetJets, however, forced Appellant into a Federal Aviation Administration ("FAA") check ride where she failed the engine out maneuver.

NetJets argues that Appellant refused additional training and another opportunity for a check ride. By this time, NetJets' own flight instructor advised NetJets that Appellant could not attain full rudder control due to her stature. Simply, Appellant said that additional training and check rides were not going to add 3 to 4 inches to her legs. Therefore, additional training would be futile, not to mention unsafe.

5

The night of the failed check ride, Jim Queen, Assistant Director of Training for NetJets, requested Appellant attend a meeting the next day to figure out next steps. Appellant arrived at the March 1, 2017 meeting only to be greeted with a letter of termination citing a failure to pass the probationary period. NetJets provided no other information. Appellant was totally shocked and speechless. Based on her telephone call with Queen the night before, Messenger's documented declaration that her short stature precluded attaining sufficient rudder authority, and her type-rating in two (2) other aircrafts in NetJets' fleet, she genuinely believed that the purpose of the meeting was to determine other options, or another NetJets aircraft, for her continued employment with NetJets.

Appellant also based her belief on NetJets prior transfer, or reassignment, of three male pilots to another aircraft who were "unable to safely fit in and operate the Phenom." According to the NetJets Director of Training, the reassignment was for comfort. Either way, NetJets failed to treat Appellant in a similar manner. At the point that NetJets learned that the male pilots were "unable to safely fit in and operate the Phenom," NetJets transferred the male pilots to another aircraft. At the point that NetJets learned that Appellant was "unable to safely fit in and operate the Phenom," NetJets forced Appellant into additional futile training and a FAA check ride before terminating her. NetJets never discussed or investigated other options or reassignment for Appellant. Attempting to bypass the standard for similarly situated,

6

NetJets added that Appellant was not nice during Indoc training. Failure of the FAA check ride continues to be a blackmark on Appellant's resumé and she has not found full-time employment as a pilot since her termination.

## II.    STATEMENT OF THE CASE

During July 2015, Appellant applied for a pilot's position with NetJets. (Drerup Declaration, ¶2, R.52-5, PAGEID#734). At the time, Appellant had been a pilot for eleven (11) years and was type rated in the following five (5) aircraft: Citation 500 Series, EA500 Eclipse Jet, HS-125 Hawker 800/900, Citation CE-525, and CE525SP. (Drerup Declaration, ¶3, R.52-5, PAGEID#734; Drerup Dep., p.19, R.45-3, PAGEID#216). The Citation 500 Series includes the Citation Encore Plus, an aircraft in NetJets' fleet at the time of Appellant's hire. (Drerup Declaration, ¶3, R.52-5, PAGEID#734; Drerup Dep., pp.19-20, R.45-3, PAGEID#216). The HS-125 Hawker 800/900 was also in NetJets' fleet at the time of Appellant's hire. (Drerup Declaration, ¶3, R.52-5, PAGEID#734; Drerup Dep., pp.19-20, R.45-3, PAGEID#216). At the time of her hire, Appellant was also working towards obtaining her Master's Degree from Embry-Riddle Aeronautical University in Aeronautical Science with a Specialization in Safety, which she earned in May of 2020. (Drerup Dep., p.17, R.45-3, PAGEID#215).

During September 2016, NetJets informed Appellant that she was selected for a two-day interview process. (Drerup Declaration, ¶4, R.52-5, PAGEID#734;

Drerup Dep., pp.22-23, R.45-3, PAGEID#217). On the first day, Appellant interviewed with NetJets' pilots and Human Resources ("HR"). (Drerup Declaration, ¶5, R.52-5, PAGEID#734). On the second day, Appellant participated in a simulator evaluation for the Citation EXLS aircraft at Flight Safety International, Inc. ("FSI"). (Drerup Declaration, ¶6, R.52-5, PAGEID#735; Drerup Dep., p.23, R.45-3, PAGEID#217). FSI is wholly owned by Berkshire Hathaway ("Berkshire"); all of FSI's work is facilitating flight training for NetJets. (Eastman Dep., p.39, R.45-6, PAGEID#386; Messenger Dep., p.61, R.45-4, PAGEID#324). Despite no prior experience with this aircraft, Appellant passed the simulation. (Drerup Declaration, ¶6, R.52-5, PAGEID#735). On November 3, 2016, NetJets formally extended an offer of employment as a Pilot to Appellant. (*Id.*, ¶7, R.52-5, PAGEID#735; Drerup Dep., pp.25-26, R.45-3, PAGEID#217-218).

Appellant began a two-week Indoc training on December 5, 2016, where she learned company policy, safety protocols, general operating principles and general company information. (Drerup Declaration, ¶¶9,12, R.52-5, PAGEID#735; Drerup Dep., pp.27, 28, R.45-3, PAGEID#218). Appellant's Indoc class consisted of twelve (12) other pilots, ten (10) male pilots and two (2) female pilots. (Drerup Declaration, ¶10, R.52-5, PAGEID#735; Drerup Dep., p.33, R.45-3, PAGEID#219). After Appellant passed her Indoc training and test, she received her NetJets' golden wings and a congratulatory note from Alan W. Bobo, Executive Vice President/Director

8

Flight Operations. (Drerup Declaration, ¶23, R.52-5, PAGEID#736; Drerup Declaration Ex. C, R.52-8, PAGEID#778). Appellant was then assigned to the Embraer Phenom 300 ("Phenom"). (Drerup Declaration, ¶25, R.52-5, PAGEID#736; Drerup Dep., p.30, R.45-3, PAGEID#219). Three male pilots, Eric Anderson, John Carrier, and Timothy Allan Buss, were reassigned to the Citation Encore Plus because they were too tall for the Phenom. (Drerup Declaration, ¶26, R.52-5, PAGEID#736; Defendant's Responses to Plaintiff's First Set of Interrogatories, Interrogatory 12, p.5, attached to Plaintiff's Mem. In Opp. To Defendant's Mot. for Summ. J. as Ex. 1, R.52-1, PAGEID#727). A fourth pilot requested to be placed in another plane and his request was granted. (Drerup Declaration, ¶26, R.52-5, PAGEID#736).

Appellant completed her computer-based training on February 4 and 5, 2017 and began ground training on February 6, 2017. (Drerup Declaration, ¶¶27-28, R.52-5, PAGEID#736). NetJets assigned Felton as Appellant's study and simulator partner. (*Id.*, ¶29, R.52-5, PAGEID#737). Felton had been a NetJets pilot and Captain for fifteen (15) years, most recently flying the Citation X. (*Id.*, ¶30, R.52-5, PAGEID#737). Appellant completed Phenom Aircraft Systems and Garmin Prodigy training from February 7-14, 2017. (*Id.*, ¶31, R.52-5, PAGEID#737; Drerup Dep., p.33, R.45-3, PAGEID#219). Appellant then passed her FAA oral examination.

(Drerup Declaration, ¶32, R.52-5, PAGEID#737; Drerup Dep., p.34, R.45-3, PAGEID#220).

On February 15, 2017, Appellant and Felton began seven (7) Simulator ("Sim") training sessions of FAA required maneuvers and approaches. (Drerup Declaration, ¶33, 34, R.52-5, PAGEID#737; Drerup Dep., p.35, R.45-3, PAGEID#220). During the first two days, Felton and the FSI training instructor argued constantly, impeding Appellant's training progress. (Drerup Declaration, ¶35, R.52-5, PAGEID#737; Drerup Dep., p.52, R.45-3, PAGEID#224; Felton Dep., p.23, R.49, PAGEID#646). Felton asked Leon Lambert, Program Manager for FSI, for a different FSI training instructor citing his ongoing conflict with the FSI training instructor. (Drerup Declaration, ¶38, R.52-5, PAGEID#737; Felton Dep., p.22, R.49, PAGEID#646). Lambert assigned Boyd Ashley Messenger as Felton's new FSI training instructor. (Drerup Declaration, ¶39, R.52-5, PAGEID#737; Drerup Dep., pp.43-44, R.45-3, PAGEID#222). Appellant then requested reassignment back to Felton as her Sim partner, which Lambert granted. (Drerup Declaration, ¶40, R.52-5, PAGEID#737; Drerup Dep., p.42, R.45-3, PAGEID#222). When Messenger took over the Sim training on February 17, 2017, he advised Appellant that he could catch up on the items that Appellant missed, and fell behind on, during Sim 1 and 2 due to the conflict between Felton and the original FSI training instructor. (Drerup Declaration, ¶41, R.52-5, PAGEID#738).

As Appellant began performing engine out procedures, it became apparent that she was struggling to maintain aircraft control with one engine operating on full power and the other engine failed. (Drerup Declaration, ¶42, R.52-5, PAGEID#738; Felton Dep., p.25, R.49, PAGEID#647). The Phenom required the pilot to immediately push the rudder pedal all the way to the floor in order to keep the nose of the plane from turning and rolling toward the failed engine. (Drerup Declaration, ¶43, R.52-5, PAGEID#738).

Appellant previously never struggled on any of the other five aircrafts for which she was type rated. (Drerup Declaration, ¶44, R.52-5, PAGEID#738). When Appellant discussed it with Messenger, he said that he had never instructed on an aircraft that required the pilot to immediately put the rudder completely to the floor so to keep the aircraft controlled in his years of teaching and it is due mostly to the smaller rudder surface area on the tail of the plane. (*Id.*, ¶45, R.52-5, PAGEID#738).

By Sim 7, which was supposed to be the last Sim training, Messenger stopped the Sim training and said, "Shari, I know why you are struggling so much with the Phenom. Your legs are simply too short. You can't reach fully to the floor with the rudder pedals to control the airplane during single engine operations." (Drerup Declaration, ¶46, R.52-5, PAGEID#738; Drerup Dep., pp.61, 67, R.45-3, PAGEID#226, 228; Felton Dep., p.26, R.49, PAGEID#647). It never occurred to Appellant that she was too short as she is type rated in much larger jets than the

11

Phenom. (Drerup Declaration, ¶47, R.52-5, PAGEID#738). Appellant adjusted the seat full forward and the seat up with the rudder pedals towards her as much as they would go so seat and rudder positions were not the problem. (*Id.*, R.52-5, PAGEID#738-739; see Drerup Dep., pp.70-71, R.45-3, PAGEID#229). Every time Appellant sits down in a cockpit, she immediately adjusts the seat and rudder pedals first. (Drerup Declaration, ¶47, R.52-5, PAGEID#739).

Messenger, Felton and Appellant went back to the debriefing room after Sim 7, where Messenger said he had seen this once during his years of teaching. (Drerup Declaration, ¶48, R.52-5, PAGEID#739). Messenger completed an Unsatisfactory Evaluation for NetJets and wrote, "Shari's stature precludes attaining sufficient control authority." (Drerup Declaration, ¶49, R.52-5, PAGEID#739; Drerup Declaration Ex. D., R.52-9, PAGEID#779). Messenger contacted Lambert while they were still in the debriefing room to advise him that Appellant was too short for the Phenom. (Drerup Declaration, ¶51, R.52-5, PAGEID#739; Drerup Dep., p.68, R.45-3, PAGEID#228). Lambert advised Messenger that he needed to sit in the Sim with Appellant to observe and verify. (Drerup Declaration, ¶52, R.52-5, PAGEID#739). Lambert, Messenger, and Felton joined Appellant in the Sim, where Appellant and Lambert sat in the cockpit. (Drerup Declaration, ¶53, R.52-5, PAGEID#739; Drerup Dep., p.69, R.45-3, PAGEID#228). Lambert conducted a few engine out take offs and showed Appellant how much rudder was required. (Drerup

12

Declaration, ¶54, R.52-5, PAGEID#739; Drerup Dep., p.69, R.45-3, PAGEID#228).

Lambert asked Appellant to push her foot all the way to the floor of the cockpit to

see if she was able to fully depress the rudder pedal. Appellant could not do it

because her legs were too short. (Drerup Declaration, ¶54, R.52-5, PAGEID#739;

Drerup Dep., pp.69-70, R.45-3, PAGEID#228-229). Messenger advised Lambert

that Appellant was just too short to fly the plane. (Drerup Dep., p.70, R.45-3,

PAGEID#229). Lambert agreed that Appellant was too short. (Felton Dep., p.31,

R.49, PAGEID#648). Lambert, Messenger, Felton and Appellant met in the

debriefing room. (Drerup Declaration, ¶55, R.52-5, PAGEID#739). Appellant

watched as Lambert telephoned the training department at NetJets and heard him

say that Appellant was having issues in the Phenom during engine out procedures.

Lambert advised that Messenger believed the problem was due to her stature; her

legs were simply not long enough. (Drerup Declaration, ¶55, R.52-5, PAGEID739;

Drerup Dep., p.68, R.45-3, PAGEID#228). NetJets angrily questioned why it took

so long in the training process to figure out that Appellant was too short. (Drerup

Declaration, ¶55, R.52-5, PAGEID#739; Drerup Dep., pp.82, 125, R.45-3,

PAGEID#232, 242). Messenger, Felton and Appellant discussed this to try to figure

this out. (Drerup Declaration, ¶55, R.52-5, PAGEID#739).

　　　Messenger explained that the first several Sim sessions were conducted in

high elevation airports such as Colorado. The simulators are capable of reproducing

engine output and yaw created by losing one engine at varying altitudes and air densities. Yaw is the side-to-side motion of the aircraft. Messenger said that the first several days of Sim training positioned the Sim where the air was less dense, *i.e.*, less air molecules than a lower elevation airport like Memphis.  As a result, the engines produce less power at these high elevations. Therefore, the amount of rudder required to offset an engine failure and the resulting yaw would be less in Colorado than the same engine out at sea level such as Memphis. Where the air is denser, the air molecules are tighter, the engine produces more power, and as a result, the pilot must put in rudder to the floor to control an engine out at sea level with one engine operating. More rudder was required to control the aircraft on Sim 7 in Memphis than had been required in the previous Sim sessions. That is precisely why Appellant was able to struggle through the engine outs the first few days, but was unable to put the amount of rudder pressure needed in Memphis. (Drerup Declaration, ¶55, R.52-5, PAGEID#739-740; Drerup Dep., pp.124-125, R.45-3, PAGEID#242). It was after this Sim that Messenger stopped the Sim to declare that the issue was Appellant's stature. (Drerup Declaration, ¶55, R.52-5, PAGEID#740).

Despite the professional opinion of Messenger, NetJets authorized another Sim session to ready Appellant for the FAA check ride. (Drerup Declaration, ¶56, R.52-5, PAGEID#740). Appellant questioned Lambert and Messenger how more training was going to make her legs longer so that she could put in full rudder. (*Id.*,

14

R.52-5, PAGEID#740). Lambert said that they could work on techniques. (*Id.*, R.52-5, PAGEID#740). Appellant expressed her concern that it was not safe for her to fly the Phenom to Lambert and Messenger. (*Id.*, R.52-5, PAGEID#740).

Appellant went back to her hotel room for the night, and she received a call from Jim Queen, Assistant Director of Training, who was rude and condescending. (Drerup Declaration, ¶57, R.52-5, PAGEID#740). Queen said to do whatever she needed to do to pass the check ride. (*Id.*, R.52-5, PAGEID#740). Queen told Appellant to go to Cincinnati to get a booster seat or some platform shoes because they hired Appellant to fly the Phenom so she needed to make it work. (*Id.*, R.52-5, PAGEID#740; Drerup Dep., pp.84, 93-94, R.45-3, PAGEID#232, 234-235). NetJets policy expressly prohibits pilots from wearing platform shoes. (Queen Dep., pp.68-69, R.45-8, PAGEID#483-484). Appellant told Queen that she was type rated in two of NetJets' other aircraft. (Drerup Declaration, ¶57, R.52-5, PAGEID#740-741). Queen stated, and Appellant disputed, if Appellant was too short to fly the Phenom, then Appellant would be too short to fly any of NetJets' other aircrafts. (*Id.*, R.52-5, PAGEID#741; Drerup Dep., pp.91, 94, R.45-3, PAGEID#234, 235). Queen did not care and said, "Make the Phenom work." (Drerup Declaration, ¶57, R.52-5, PAGEID#741; Drerup Dep., p.91, R.45-3, PAGEID#234).

During the telephone call with Queen, Appellant told him it was not safe for her to fly the Phenom due to her stature. (Drerup Declaration, ¶57, R.52-5,

PAGEID#741; Drerup Dep., p.91, R.45-3, PAGEID#234). Queen's suggestions were not safe; instead, the suggestions were meant to make Appellant pass the Sim check and check ride. (Drerup Dep., p.95, R.45-3, PAGEID#235). Felton and Appellant went to the mall and bought a pair of shoes with thick soles as Queen ordered. (Drerup Declaration, ¶58, R.52-5, PAGEID#741).

When Appellant trained on February 23, 2017, Lambert sat in the cockpit with Appellant and Messenger instructed in the back of the Sim, and Appellant worked on techniques for the engine out procedure. (Drerup Declaration, ¶61, R.52-5, PAGEID#741). Appellant had thicker soled shoes and pillows to try to help her achieve full deflection on the rudder pedals to no avail as she needed an additional three to four inches to fully deflect the rudder pedals. (Drerup Dep., pp.85-88, R.45-3, PAGEID#232-233). Messenger warned Appellant each time before the engine out procedure occurred. (Drerup Declaration, ¶61, R.52-5, PAGEID#741). With the forewarning, Appellant was able to slide down in the seat as the engine out occurred and was able to obtain rudder authority before the plane started to yaw and roll. (Drerup Declaration, ¶61, R.52-5, PAGEID#741; see Drerup Dep., pp.71, 79-80, R.45-3, PAGEID#229, 231). Even knowing that the engine was going to fail, Appellant did not successfully perform the engine out maneuver every time. (Drerup Dep., pp.75-76, R.45-3, PAGEID#230). Appellant received additional training on engine out procedures on February 26, 2017. (Drerup Dep., p.78, R.45-3,

PAGEID#231). Appellant only "squeak[ed] out a maneuver once out of 20 to get a 1" so NetJets could approve her check ride (Drerup Dep., p.82, R.45-3, PAGEID#232).

After this additional Sim training, NetJets authorized Appellant to take the check ride on February 28, 2017. (Drerup Declaration, ¶62, R.52-5, PAGEID#741). Even though FSI declared Appellant proficient in this forewarned Sim maneuver, she would not be proficient during an unexpected engine out emergency in the actual aircraft. (Drerup Declaration, ¶62, R.52-5, PAGEID#741-742; Drerup Dep., pp.79, 81, R.45-3, PAGEID#231). FSI knew this as well. Messenger said he did not care how she controlled the aircraft, as long as she achieved the standard. (Messenger Dep., pp.50-51, R.45-4, PAGEID#322).

As required, Appellant participated in the check ride on February 28, 2017. (Drerup Declaration, ¶63, R.52-5, PAGEID#742). As always, Appellant adjusted the seat and the pedals when she first sat in the cockpit. (Id., R.52-5, PAGEID#742; Drerup Dep., pp.98-99, 105, 107, R.45-3, PAGEID#236, 237, 238). Appellant wore thicker soled shoes as Queen ordered. (Drerup Declaration, ¶63, R.52-5, PAGEID#742; Drerup Dep., p.98, R.45-3, PAGEID#236). Appellant had no problems until the Sim instructor failed an engine. (Drerup Declaration, ¶63, R.52-5, PAGEID#742). Unlike Sim training, the instructor did not notify Appellant prior to the engine out. Appellant was limited by her stature. Therefore, Appellant could

not obtain full rudder authority, fully deflecting the rudder pedal to the floor, to avoid a crash. (*Id.*, R.52-5, PAGEID#742; Drerup Dep., p.100, R.45-3, PAGEID#236). The FAA stopped the check ride and failed Appellant. (Drerup Declaration, ¶64, R.52-5, PAGEID#742; Drerup Dep., pp.100, 113, R.45-3, PAGEID#236, 239). It was futile to continue the check ride because Appellant was too still short to safely fly the Phenom. (Drerup Dep., p.114, R.45-3, PAGEID#240).

Lambert and Appellant went back to the debriefing room. (Drerup Declaration, ¶65, R.52-5, PAGEID#742). Lambert discussed NetJets authorizing another Sim session and another check ride in five (5) days. (*Id.*, R.52-5, PAGEID#742). Appellant again expressed her concern that she was too short and she would fail the next check ride, too. (*Id.*, R.52-5, PAGEID#742). From a safety standpoint, Appellant's legs were too short to reach full rudder deflection should she need to do so in a real aircraft during a real emergency. (*Id.*, R.52-5, PAGEID#742).

Queen telephoned Appellant to advise her of a meeting the next day with the Chief Pilot for the Phenom and another pilot for NetJets to figure out what to do. (Drerup Declaration, ¶66, R.52-5, PAGEID#742). Appellant was fully expecting NetJets to work with her and discuss other options, such as placement in another aircraft. (Drerup Dep., p.134, R.45-3, PAGEID#245). When Appellant arrived at the meeting on March 1, 2017, she was terminated. (Drerup Declaration, ¶67, R.52-5, PAGEID#742). NetJets did not provide a specific reason but read Appellant a

18

termination letter dated March 1, 2017 stating that she was being terminated "for failure to successfully complete [her] probationary period." (*Id.*, R.52-5, PAGEID#742; Drerup Declaration, Ex. F, R.52-11, PAGEID#781).

NetJets filed a Motion for Summary Judgment on November 15, 2021. (Def. Mot. for Summ. J., R.45, PAGEID#187-205). Appellant filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment on December 9, 2021. (Pl.'s Mem. In Opp. To Defendant's Mot. for Summ. J., R.52, PAGEID#689-722). NetJets filed a Reply Memorandum in Support of Defendant's Motion for Summary Judgment on December 23, 2021. (Def. Reply Mem., R.54, PAGEID#789-799). On May 2, 2022, the District Court entered an Opinion and Order granting NetJets' Motion for Summary Judgment, and the Clerk entered Judgment pursuant to the Court's Order. (Opinion, R.58, PAGEID#814-834; Judgment, R.59, PAGEID#835). Appellant timely filed her Notice of Appeal on May 24, 2022. (Appeal, R. 60, PAGEID#836). The District Court's Order is properly appealed to this Court pursuant to 28 U.S.C. § 1291.

## III.    SUMMARY OF THE ARGUMENT

Appellant has established the *prima facie* case. As a woman, she is a member of a protected class. Appellant was subject to an adverse employment action as NetJets terminated her employment. As an experienced pilot, NetJets hired Appellant because she was qualified for the position. NetJets treated similarly

situated male pilots treated more favorably than Appellant. Specifically, NetJets immediately transferred three (3) male pilots to different aircraft at the time it determined the male pilots' stature precluded them from flying the Phenom.

Since Appellant's termination, the failure to pass the probationary period reason morphed into: (1) Appellant demonstrated persistent difficulty during her Phenom simulator training; (2) after having been rated proficient in all maneuvers and recommended for a check ride by FSI, Drerup chose not to continue her check ride after she performed the engine failure on the missed approach maneuver unsatisfactorily; (3) Appellant declined an opportunity to continue training in the Phenom; and (4) two employees expressed concerns regarding Appellant's demeanor and how it did not seem aligned with NetJets' service training during Indoc, an issue never mentioned until litigation.

A reasonable jury could certainly find that the first three reasons are primarily attributed to Appellant's stature. She does not safely fit in the Phenom. For that reason, NetJets reassigned three (3) new male pilots to another aircraft. Just because NetJets did not force the male pilots through training and a check ride does not negate the reason for reassignment of the male pilots due to their stature. According to Merriam-Webster Dictionary, stature is defined as the natural height (as of a person) in an upright position. https://www.merriam-webster.com/dictionary/stature, site last visited December 9, 2021. Admitted though

unnamed, NetJets granted the request of another male pilot for reassignment from the Phenom to another aircraft. According to Sean Kennedy, comfort was a reason for reassignment. Either way, NetJets' actions certainly demonstrate a decision based on sex.

A reasonable jury could also find that the allegations of bad attitude were fabricated and elicited to paper the file. Until litigation, Appellant had no idea Eastman and Krause had any alleged issue with her. Eastman and Krause only provided emails at Sean Kennedy's request on February 28, 2017, the day before Appellant's termination, and two and a half months after the alleged problematic encounters. Jackson handpicked Appellant to partner with his colleague, Felton, specifically because of her southern belle personality. NetJets had no problem with Felton's demeanor or his arguing with the flight instructor for days, impeding training for both he and Appellant. Felton suffered no negative consequences though NetJets held his documented delay against Appellant.

Instead of discussing options, such as transferring Appellant to another NetJets' aircraft in which she was already type-rated or could train as it did with the male pilots, NetJets forced Appellant into additional training and a FAA check ride will full knowledge that she would fail and then blamed Appellant. As a result, Appellant has since been unable to obtain employment as a Pilot. A reasonable jury

could find that NetJets' actions, at the time it learned from Messenger that Appellant did not fit in the Phenom, were discriminatory and her termination unlawful.

## IV.    ARGUMENT

### A.    Standard of Review.

This Court reviews the District Court's grant of summary judgment *de novo*. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). Summary judgment is a granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The appellate court "will reverse a grant of summary judgment if the nonmoving party has presented evidence of specific facts, which, viewed in the most favorable light, indicates that there is a genuine issue for trial." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (*en banc*). In making this determination, this Court may not weigh the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in her favor. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**B.      Appellant Established that NetJets Discriminated against Her because of Her Sex.**

In Counts I and II, Appellant asserts that NetJets violated federal and state law by discriminating against her on the basis of sex. (Amended Complaint, R.7, PAGEID#33-34). Under Title VII, it is illegal "for an employer…to discharge any individual, or otherwise discriminate against any individual with respect to his…sex." 42 U.S.C. §2000e-2(a)(1). Ohio law provides that:

> It shall be an unlawful discriminatory practice…[f]or an employer, because of…sex…to discharge without just cause…or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

O.R.C. 4112.02(A). Despite the differences in language, federal case law interpreting Title VII sex discrimination claims generally applies to cases asserting violations of O.R.C. Chapter 4112. *Threat v. City of Cleveland*, 6 F.4th 672, 680 (6th Cir. 2021) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (Ohio 1981)).

In the absence of direct evidence of sex discrimination, Appellant relies on the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish her *prima facie* case of sex discrimination. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Establishing a *prima facie* case creates a rebuttable presumption that NetJets engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). Once Appellant has

established a prima facie case of sex discrimination, NetJets must assert a legitimate, nondiscriminatory reason for Appellant's termination. *Chen*, 580 F.3d at 400. In response, Appellant must show that NetJets' alleged legitimate, nondiscriminatory reason is pretext for discrimination. *Id.*

### 1. Appellant established a prima facie case of sex discrimination.

To establish a *prima facie* case of sex discrimination, Appellant must prove the following: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016). The burden of establishing a *prima facie* case is not onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct.1089, 67 L.Ed.2d 207 (1981); see, also, *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015); *White v. Baxter Health Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 528 (6th Cir. 2007).

The Sixth Circuit has explained that whether an employee is "similarly situated" in all relevant factors is a flexible standard and that the factors considered are unique to each case. *McMillan v. Castro*, 405 F.3d 405, 413-14 (6th Cir. 2005); *Gatch v. Milacron, Inc.*, 111 Fed. Appx. 785, 793 (6th Cir. 2004). In *Mitchell v. Toledo Hospital*, the Sixth Circuit held that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment *must have*

*dealt with the same supervisor*, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original). The Sixth Circuit has since clarified that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose--an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Although "these factors generally are all relevant considerations in cases alleging differential disciplinary action," the Sixth Circuit explained:

> courts should not assume…that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in *Pierce [v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)]*, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

*Id.* (citation and footnote omitted).

Appellant identified three male comparators who were immediately reassigned from the Phenom to the Citation Encore Plus when NetJets discovered the male pilots were too tall for the Phenom: Eric Anderson, John Carrier and

Timothy Allan Buss. (Drerup Dep., pp.139-141, R.45-3, PAGEID#246; Drerup Declaration, ¶26, R.52-5, PAGEID#736). In its responses to Plaintiff's First Set of Interrogatories to Defendant, NetJets admitted that it hired Eric Anderson, John Carrier and Timothy Allan Buss for the Phenom but moved them to the Citation Encore Plus aircraft because they were too tall for the Phenom and, therefore, "unable to safely fit in and operate the Phenom." (Defendant's Responses to Plaintiff's First Set of Interrogatories, Interrogatory 12, p.5, attached to Plaintiff's Mem. In Opp. To Defendant's Mot. for Summ. J. as Ex. 1, R.52-1, PAGEID#727). When Messenger determined, and advised NetJets, that Appellant's stature prevented her from safely flying the Phenom, NetJets failed to reassign Appellant to another aircraft, just as it did for the male pilots.

Instead, NetJets ordered Appellant to "make the Phenom work" and do whatever she needed to pass the check ride. (Drerup Declaration, ¶57, R.52-5, PAGEID#; Drerup Dep., pp. 84, 93-94, D. 45-3, PAGEID# 232, 234-235; Queen Dep., p.75, R.45-8, PAGEID#485). Appellant did as NetJets instructed by purchasing thicker soled shoes and using pillows to put herself closer to the rudder. (Drerup Declaration, ¶58, R.52-5, PAGEID#741; Drerup Dep., pp.85-88, R.45-3, PAGEID#232-233). NetJets telegraphed engine out during Sim training to allow Appellant to compensate for her small stature. (Drerup Declaration, ¶61, R.52-5, PAGEID#741; see Drerup Dep., pp.71, 79-80, R.45-3, PAGEID#229, 231). Even

the warnings right before the engine failed did not negate the fact that Appellant could not safely fit in and operate the Phenom. (Drerup Dep., pp.75-76, R.45-3, PAGEID#230). Appellant only "squeak[ed] out a maneuver once out of 20 to get a 1" to be approved for her check ride. (Drerup Dep., p.82, R.45-3, PAGEID#232). Appellant was not proficient or safe in the engine out maneuver. (Drerup Dep., pp.79, 81, R.45-3, PAGEID#231). As expected, Appellant failed the FAA check ride. (Drerup Declaration, ¶¶63, 64, R.52-5, PAGEID#742; Drerup Dep., pp.100, 113, R.45-3, PAGEID#236, 239). And NetJets knew Appellant would fail the FAA check ride.

The District Court erroneously rejected Appellant's argument that the three male comparators were similarly situated to Appellant. Preliminarily, the District Court noted that Appellant's argument that Appellant should have been transferred immediately upon NetJets learning that Appellant's stature prevented her from safely flying the Phenom had "surface appeal," but the District Court ultimately rejected the argument because of facts "[b]elow the surface." (Opinion, p.12, R.58, PAGEID#825). First, the District Court determined that, unlike the male pilots, Appellant "fit" in the Phenom. (*Id.*, p.13, R.58, PAGEID#826). Second, the District Court held that Appellant "has not presented any evidence that the male pilots struggled during simulator training, failed check rides, declined to continue, and refused additional training." (*Id.*, R.58, PAGEID826). Finally, the District Court

noted that Appellant "makes no effort to explain why she struggled with flying because of her height, but other small-stature female pilots are able to fly the Phenom." (*Id.*, R.58, PAGEID#826).

The District Court improperly distinguished the male comparators from Appellant by asserting that Appellant "fit" in the Phenom while her male comparators did not. As NetJets stated, the male pilots were "unable to safely fit in and operate the Phenom." (Defendant's Responses to Plaintiff's First Set of Interrogatories, Interrogatory 12, p.5, attached to Plaintiff's Mem. In Opp. To Defendant's Mot. for Summ. J. as Ex. 1, R.52-1, PAGEID#727). Appellant was also "unable to safely fit in and operate the Phenom."

The key determination is whether a pilot's stature will allow the pilot to safely fly the Phenom. In its responses to Plaintiff's First Set of Interrogatories, NetJets admitted that it reassigned the three male pilots for safety reasons. (Defendant's Responses to Plaintiff's First Set of Interrogatories, Interrogatory 12, p.5, attached to Plaintiff's Mem. In Opp. To Defendant's Mot. for Summ. J. as Ex. 1, R.52-1, PAGEID#727). Sean Kennedy, NetJets' Director of Training in 2017, added that it was a "question of comfort." (Kennedy Dep., pp. 11, 13, R.45-10, PAGEID#583). As soon as NetJets learned that the male comparators would not "safely fit in and operate the Phenom," NetJets reassigned the males to another aircraft. NetJets learned from its own flight instructor, Messenger, that Appellant's "stature precludes

28

attaining full rudder authority." Messenger advised NetJets verbally and in writing. (Drerup Declaration, ¶49, R.52-5, PAGEID#739; Drerup Declaration Ex. D., R.52-9, PAGEID#779).

At the point that NetJets became aware that the male pilots did not safely fit in the Phenom, it reassigned them to another aircraft. At the point NetJets became aware that Appellant did not safely fit in the Phenom, NetJets should have reassigned her to another aircraft per its protocol with the male pilots.

The District Court held that the male pilots are not appropriate comparators because they did not struggle during simulator training, fail check rides, decline to continue, and refuse additional training. In reality, the male comparators were not forced into an unsafe situation destined for pilot failure. A simple measurement was accepted without question and NetJets reassigned/transferred the male comparators to another aircraft.  In contrast, the NetJets flight safety instructor specifically stated and informed NetJets that Appellant's "stature precluded obtaining sufficient rudder authority" meaning Appellant was "unable to safely fit in and operate the Phenom." Thus, the issues identified by the District Court are irrelevant and do not eliminate the male pilots as comparables.

Finally, the District Court faults Appellant for "mak[ing] no effort to explain why she struggled with flying because of her height, but other small-stature female pilots are able to fly the Phenom." (Opinion, p. 13, R.58, PAGEID#826). NetJets did

not assert this argument in its Memorandum in Support of Defendant's Motion for Summary Judgment. Instead, NetJets made this argument in its Reply Memorandum. (Reply Mem. In Support of Defendant's Mot. For Summ. J., p.7, D.54, PAGEID#795). The District Court's logic assumes facts not in evidence, *i.e.*, that the other alleged small-statured female pilots were of the same build and body type as Appellant. Not all women, including those of the same height measurement, are built the same way or have the same leg length. Clearly, Appellant's legs may be shorter than another female pilot who, therefore, is able to fully push the rudder to the cockpit floor and successfully perform the engine out maneuver. No amount of additional Sim training was going to make Appellant's legs longer. The District Court's assumption is not based in evidence.

### 2. Appellant established that NetJets' alleged legitimate, nondiscriminatory reason for Appellant's Termination was pretext for sex discrimination.

Though NetJets offered alleged legitimate, nondiscriminatory reasons for Appellant's termination, Appellant may demonstrate pretext for discrimination by presenting evidence that NetJets' proffered reasons (1) have no basis in fact; (2) did not actually motivate the termination; or (3) was insufficient to motivate the termination. *Corrigan v. U.S. Steel Corp.,* 478 F.3d 718, 728 (6th Cir. 2007) (citation omitted).

The first example of pretext "consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citation omitted). Under the second showing, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* The third type of pretext ordinarily consists of evidence that other employees, particularly employees that did not engage in the protected activity, "were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.*

Ultimately, pretext is a commonsense inquiry: did NetJets fire Appellant for the stated reasons or not? *Chen*, 580 F.3d at 400, n.4. Appellant's "burden is not heavy" and "summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual. *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020) (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547-48 (6th Cir. 2004)).

The District Court relied on *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977), citing *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972), for the proposition that NetJets "bears a [ ] lighter burden to show that his employment criteria are job-related" because the "job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great[.]" This case is about a pilot possessing the correct body measurements to safely fit into a specific aircraft. Appellant is an accomplished and qualified pilot who just happens to have legs too short to "safely fit in and operate the Phenom." Essentially, the District Court created a new rule giving great deference to NetJets to determine whether Appellant was qualified for the pilot position based on the length of her legs. This reliance on *Boyd* is misguided and erroneous.

*Boyd* involved a class action asserting that a policy requiring a height requirement had a disparate impact against women. The issue in *Boyd* was whether the height requirement was a business necessity. Appellant's case is a disparate treatment claim, not a disparate impact claim. Appellant's case involves whether she was treated differently than similarly situated male pilots. Therefore, *Boyd* is not relevant. Further, *Boyd* does not address the issue of pretext. By relying on *Boyd*, the District Court inappropriately determined that Appellant was not qualified for her position as pilot, an issue that is not in dispute.

a.    Appellant proved pretext because of NetJets' shifting explanations for its decision to terminate Appellant.

The District Court determined that Appellant failed to raise a genuine issue of material fact that NetJets' reasons for Appellant's termination shifted in a material way. The District Court held that NetJets' explanations were clarifications, not shifting. (Opinion, pp.16-17, R.58, PAGEID#829-830).

Appellant may prove pretext because of NetJets' changing rationale for Appellant's termination. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996). "Shifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

At the time of Appellant's termination, NetJets never provided a reason for her termination. (Drerup Declaration, ¶67, R.52-5, PAGEID#742). Instead, NetJets simply read Appellant's termination letter that stated that she was terminated "for failure to successfully complete [her] probationary period." (Drerup Declaration, ¶67, R.52-5, PAGEID#742; Drerup Declaration, Ex. F, R.52-11, PAGEID#781). NetJets never provided any details. But, any reason later provided by NetJets occurred after, and as a result of, NetJets knowledge that Appellant's stature did not "safely fit in and operate the Phenom."

33

In Interrogatory 7 of Plaintiff's First Set of Interrogatories to NetJets, Appellant asked, "Set forth each and every reason that Defendant terminated Plaintiff's employment on or about March 1, 2017." (Def. Responses to Pl. First Set of Interrogatories, Interrogatory No. 7, p. 4, Ex. 1, R.52-1, PAGEID#726). NetJets responded: "Plaintiff's employment was terminated because she failed to successfully complete her probationary period. This decision was reached after considering Plaintiff's performance on her check ride and her attitude and behavior during her probationary period." (*Id.*, Ex. 2). In its discovery response, NetJets stated that it was Appellant's failure of the check ride and her attitude during the probationary period, which relates solely to her alleged problematic interactions with Eastman and Krause during Indoc. In its discovery responses, NetJets never mentioned Appellant's alleged difficulties with her Phenom Sim training, discontinuing the check ride after she failed the engine out procedure, and not seeking additional training. Clearly, NetJets has shifting explanations for Appellant's termination, which establishes pretext.

### b.   NetJets did not terminate Appellant for the reasons it alleged.

The District Court held that Appellant did not cast substantial doubt on the cumulative reasons for her termination and, therefore, failed to raise a genuine issue of material fact that NetJets' proffered reasons did not actually motivate its actions. (Opinion, p.17, R.58, PAGEID#830). Any alleged reason beyond the point that

34

Messenger informed NetJets that Appellant would not "safely fit in and operate the Phenom," is irrelevant. At that time NetJets should have reassigned/transferred Appellant to another aircraft as it did with her male comparables who did not "safely fit in and operate the Phenom." Nonetheless, Appellant addresses the alleged reasons later given for her termination.

       i.    *NetJets did not terminate Appellant because of her difficulty during her Phenom simulator training.*

NetJets asserted that it terminated Appellant because of her difficulty during her Phenom simulator training. (Mot. for Summ. J., p.11, R.45, PAGEID#197). Appellant argued that if NetJets, in fact, terminated Appellant because of her difficulty during the Phenom simulator training, it would not have allowed her to continue with extra training on February 23, 2017 and February 26, 2017. Appellant also argued that NetJets would not have allowed Appellant to take the check ride on February 28, 2017. Finally, Appellant argued that if NetJets truly terminated Appellant because of her difficulties with the Phenom simulator training, it would have terminated her at the end of Sim 7 when she could not successfully complete the engine out maneuver due to her short stature.

The District Court determined that "an employer would offer additional training to a pilot struggling into its decision to termination that pilot." (Opinion, p.18, R.58, PAGEID#831). NetJets did not make such a statement. Further, it is not

logical for NetJets to force Appellant into the check ride if it terminated her for her struggles during simulator training.

> ii.    *NetJets did not terminate Appellant because she did not continue her check ride after she failed and/or because she did not complete additional training in the Phenom.*

NetJets argues that Appellant's failure to continue her check ride after she failed and her decision to decline additional training is evidence of her alleged attitude issues. (Mot. for Summ. J., p. 13, D. 45). Continuing the check ride and additional training were futile as they would not add inches to Appellant's legs. (Drerup Dep., pp.85-88, R.45-3, PAGEID#232-233). Though they already knew, Appellant advised Messenger, Lambert and Queen that it was not safe for her to fly the Phenom because her stature precluded her ability to maintain control of the aircraft during an engine out procedure, or "safely fit in and operate the Phenom." (Drerup Declaration, ¶¶56, 57, R.52-5, PAGEID#740-741). Despite this, NetJets forced Appellant to continue training in the Phenom and ordered Appellant to buy platform shoes and a booster seat. (Drerup Declaration, ¶57, R.52-5, PAGEID#740-741; Drerup Dep., pp.80-81, R.45-3, PAGEID# 231). NetJets, however, reassigned Appellant's male comparators to a new aircraft for the same reason. A reasonable jury could find that the pressure NetJets and Queen put on Appellant to make the Phenom work was very likely the same pressure NetJets put on Messenger and FSI to make the Phenom work for Appellant.

NetJets relies on the "honest belief" rule, arguing that NetJets reasonably relied on the FSI training records and believed that Appellant was fully capable to operate the Phenom. (Mot. for Summ. J., p.12, R.45, PAGEID#198). The "honest belief" rule provides that "when an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 322 (6th Cir. 2019) (internal quotations and citations omitted). But the "honest belief" rule is not without limits. "[A]n employee can still overcome the 'honest belief rule' by pointing to evidence that 'the employer failed to make a reasonably informed and considered decision before taking its adverse employment action.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998).

FSI expressly state on Appellant's Flight Training Record and NetJets' Unsatisfactory Evaluation that "Shari's stature precludes attaining sufficient rudder authority." (Drerup Declaration, Ex. D, R.52-9, PAGEID#779). This statement means that Appellant could not "safely fit in and operate the Phenom." Yet, NetJets ignores this specific fact just as it ignores Appellant's numerous statements to NetJets and FSI that she could not safely fly the Phenom due to her stature. Given the pressure that Queen put on Appellant to make the Phenom work, as well as NetJets' anger as to "why the hell" it took so long to figure out that Appellant was

37

too short for the Phenom, it is clear that NetJets was aware that Appellant was too short to safely operate the Phenom. NetJets did not make a reasonably informed decision when it terminated Appellant or when it forced additional Phenom training and a FAA check ride upon her. NetJets knew exactly what the problem was – Appellant could not "safely fit in and operate the Phenom." NetJets knew this because Messenger documented it. (Drerup Declaration, Ex. D, R.52-9, PAGEID#781). FSI, whose work only included instructing NetJets' pilots, employed Messenger and 90% of Messenger's work involved training NetJets' pilots. (Messenger Dep., p. 61, R.45-4, PAGEID#324). There is nothing honest in NetJets alleged belief that Appellant was capable of operating the Phenom. Their own flight instructor documented that Appellant could not operate safely the Phenom through no fault of her own and solely the result of stature.

> ### iii.    *NetJets did not terminate Appellant because of an alleged attitudinal problem.*

The District Court held that Appellant failed to show that NetJets did not honestly believe Eastman and Krause's assessments that Appellant's demeaner did not meet the high bar required for a NetJets' pilot. (Opinion, p.19, R.58, PAGEID#832). The District Court ignored the suspicious timing of the allegations, after learning that Appellant could not "safely fit in and operate the Phenom." The District Court also ignored the arguments between Felton and the first flight instructor, which occurred to the point of delaying Sim training for Appellant.

Felton received no disciplinary action, verbal warning, or even scoffing from NetJets. Only Appellant was penalized.

NetJets did not terminate Appellant because of her interactions with Eastman and/or Krause. Appellant's alleged interactions with Eastman and Krause occurred during Indoc training, which began on December 5, 2017 and lasted for two weeks. (Eastman Dep., Ex. 33, Eastman Complaint, attached to Plaintiff's Memo. In Opp. To Defendant's Mot. for Summ. J. as Exhibit 3, R.52-3, PAGEID#731; Krause Dep. Ex. 34, Krause Complaint, attached to Plaintiff's Mem. In Opp. To Defendant's Mot. for Summ. J. as Exhibit 4, R.52-4, PAGEID#732). No one ever approached Appellant about her alleged attitude problems during her Indoc training, or at any point thereafter. (Drerup Declaration, ¶¶18-19, R.52-5, PAGEID#736). NetJets graduated Appellant without mention of the alleged issues. If NetJets honestly believed the alleged attitude problems to be true or a terminable offense, the offensive attitude would have come to light at the time it occurred, not as an afterthought addition to NetJets' justification for Appellant's termination. The District Court totally ignores the fact that NetJets had no issue with Felton's attitude during his three-day argument with his flight instructor.

Further, Eastman and Krause provided emails as requested by Sean Kennedy on February 28, 2017, the day before Appellant's termination, and two and a half months after the alleged problematic encounters. (Eastman Dep., p.113, R.45-6,

PAGEID#404; Krause Dep., p.12, R.45-7, PAGEID#449). A reasonable jury could find that the timing of the emails was simply NetJets papering Appellant's file to support her discriminatory termination. *Santoli v. Vill. of Walton Hills*, No. 1:12-CV-1022, 2015 U.S. Dist. LEXIS 27204, *19-20 (N.D. Ohio March 3, 2015). This is the type of tactic that *Bostock*, *McMillan and Ercegovich* negate.

A reasonable jury would certainly question the suspicious timing of the emails coupled with Felton's arguments with his flight instructor. The District Court's reliance on NetJets' honest belief defense, asserting that NetJets honestly believed Eastman's and Krause's emails, was misplaced. (Opinion, p.19, R.58, PAGEID#832).

**C.     Appellant Did Not Abandon her Mixed Motive Claim.**

Relying on *EEOC v. Home Depot, USA, Inc.*, No. 4:07-CV-143, 2009 U.S. Dist. LEXIS 11596, *49-50 (N.D. Ohio Feb. 17, 2009), *Conner v. Hardee's Food Sys.*, 65 Fed. Appx. 19, 24 (6th Cir. 2003), and *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F.Supp.2d 812, 839 (E.D. Mich. 2008), the District Court held that Appellant abandoned her mixed motive claim because she did not address this claim in her opposition memorandum. (Opinion, p. 20, R.58, PAGEID#833). *Home Depot* and *Conner* are easily distinguishable from the case at bar because in those cases, the defendants addressed the specific claims in their respective motions for summary judgment.

In *Anglers*, however, the defendant failed to address the plaintiff's road density claim, but the court held that the defendant intended to dispose of the entirety of the plaintiff's claims in its omnibus summary judgment motion. *Anglers* is not controlling as it is only a District Court opinion. This Court should reject the reasoning of *Anglers*. Defendants are obligated to include all of plaintiffs' claims in motions for summary judgment.

Plaintiffs should not shoulder the burden of addressing arguments absent from defendants' motions for summary judgment as it is tantamount to mind-reading. This approach is supported by *Evans v. Plummer*, 687 F. Appx. 434, 446 (6th Cir. 2017). In *Evans*, the court stated:

> Feehan first argues that Evans abandoned the taser-pointing claim by failing to respond adequately to Defendants' summary judgment motion on this point. We disagree. "[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). Rather, the moving party "always bears the burden of demonstrating the absence of a genuine issue as to a material fact," and the district court is required "to examine the movant's motion for summary judgment to ensure that he has discharged that burden." *Id.* (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see* Fed. R. Civ. P. 56(a). In this case, the district court considered the evidence cited by Defendants in their motion—primarily the videos—and decided that Feehan had not met his burden. "No defense to an insufficient showing is required," so Evans did not abandon her claim against Feehan by not addressing the taser-pointing claim in her response to Defendants' summary judgment motion. *Adickes*, 398 U.S. at 161, 90 S.Ct. 1598; *Carver*, 946 F.2d at 454-55.

It is the burden of NetJets to demonstrate the absence of a material issue of fact. By failing to address Appellant's mixed motive claim in its summary judgment motion, NetJets failed to meet that burden.

## V.    CONCLUSION

Based on the foregoing, Appellant Shari Drerup respectfully requests this Court to **REVSERSE** the District Court's decision granting summary judgment in Appellee NetJets Aviation, Inc.'s favor and **REMAND** with instructions for the District Court to conduct a trial on the issues.

Respectfully Submitted,

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
**THE KNOLL LAW FIRM, LLC**
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com
*Lead Attorney for Appellant Shari Drerup*

Gloria Allred (Admitted *Pro Hac Vice*)
Dolores Y. Leal (Admitted *Pro Hac Vice*)
**ALLRED, MAROKO & GOLDBERG**
6300 Wilshire Blvd., Suite 1500
Los Angeles, CA 90048
Telephone: (323) 653-6530
Facsimile: (323) 653-1660
Email: dleal@amglaw.com
*Co-Counsel for Appellant Shari Drerup*

## <u>CERTIFICATE OF COMPLIANCE</u>

Appellant's Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,581 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
**THE KNOLL LAW FIRM, LLC**
*Lead Attorney for Appellant Shari Drerup*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing Appellant's Brief was filed electronically with the Court this 15th day of August, 2022. Counsel will be notified via the Court's electronic notification system.

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
**THE KNOLL LAW FIRM, LLC**
*Lead Attorney for Appellant Shari Drerup*

43

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS
## PURSUANT TO 6 CIR. R. 30

| Record Entry Number | Description of Document | Page ID # Range |
|---|---|---|
| 1 | Complaint | 1-10 |
| 7 | Amended Complaint | 22-34 |
| 45 | Defendant's Motion for Summary Judgment | 187-205 |
| 45-3 | Drerup Deposition | 215-220, 222, 224, 226, 228-240, 242, 245-246 |
| 45-4 | Messenger Deposition | 322, 324 |
| 45-6 | Eastman Deposition | 386, 404 |
| 45-7 | Krause Deposition | 449 |
| 45-8 | Queen Deposition | 483-485 |
| 45-10 | Kennedy Deposition | 583 |
| 49 | Felton Deposition | 646-648 |
| 52 | Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment | 689-722 |
| 52-1 | Defendant's Responses to Plaintiff's First Set of Interrogatories | 727 |
| 52-3 | Eastman Deposition Exhibit 3, Eastman Complaint, attached to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment as Exhibit 3 | 731 |
| 52-4 | Krause Deposition Exhibit 34, Krause Complaint, attached to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment as Exhibit 4 | 732 |

| Record Entry Number | Description of Document | Page ID # Range |
|---|---|---|
| 52-5 | Drerup Declaration | 734-743 |
| 52-8 | Drerup Declaration Exhibit C | 778 |
| 52-9 | Drerup Declaration Exhibit D | 779 |
| 52-11 | Drerup Declaration Exhibit F | 781 |
| 54 | Defendant's Reply Memorandum in Support of Defendant's Motion for Summary Judgment | 789-799 |
| 58 | Opinion | 814-834 |
| 59 | Judgment | 835 |
| 60 | Appeal | 836 |